O’Donnell, J.
{¶ 1} DIRECTV, Inc., and EchoStar Satellite, L.L.C. (“the satellite companies”) appeal from a decision of the Tenth District Court of Appeals and ask us to consider whether the imposition of a sales tax on the retail sale of satellite broadcasting services without also imposing the same tax on cable broadcasting services violates the Commerce Clause of the United States Constitution. As other jurisdictions that have considered this same issue have done, we conclude that the Commerce Clause protects the interstate market, not particular interstate firms or particular structures or methods of operation in a retail market. The imposition of a sales tax by the Ohio General Assembly on satellite broadcasting services but not on cable broadcasting services does not violate the Commerce Clause of the United States Constitution, because the tax is based on differences between the nature of those businesses, not the location of their activities, and it does not favor in-state interests at the expense of out-of-state interests. Accordingly, the judgment of the court of appeals is affirmed.
Factual History

Satellite and Cable Broadcasting Services

{¶ 2} The satellite companies provide pay-television programming services to consumers in Ohio and other states using satellites in fixed orbits above the *70 earth. The satellite companies purchase signals for this programming from local broadcast stations, broadcast television networks (ABC, CBS, Fox, and NBC), and providers of cable programming (such as CNN, ESPN, and HBO). They then transmit these signals from uplinks located outside Ohio to the satellites, which in turn send the signal directly to small satellite dish antennas mounted on or near the home of the subscriber to be received by a decoder box and displayed on the subscriber’s television. Other than the antenna and receiver at the subscriber’s home, this method of delivery does not require the use of additional ground-receiving and/or distribution facilities in Ohio.
{¶ 3} In the pay-television market, the satellite companies — neither of which is headquartered in Ohio — compete with cable companies, which use ground receiving and distribution facilities to provide television programming to customers. For cable television distribution, the process begins at the “headend,” a facility, usually located in or near the franchise area, that contains the collection of antennas that the cable television provider uses to gather programming from local, in-state, and out-of-state sources. However, with cable-company consolidation and technological advances, there has been a reduction in the number of headends, and some cable companies use headends located out of state. From the headend, coaxial or fiber-optic cables and amplifiers located either on utility poles or below the ground carry the signal to “hubs” servicing areas of 10,000 to 20,000 customers, which then direct the signal through feeder lines to “nodes” serving particular neighborhoods.
{¶ 4} These cables run along public rights of way, and cable companies enter into franchise agreements with local governments and pay a franchise fee to secure this right of access. The franchise fee may vary by locality, but federal law prohibits the fee from exceeding 5 percent of gross revenues. While the cable companies’ mode of distribution necessitates a local footprint, none of the major cable companies operating in Ohio are headquartered in Ohio, and all serve an interstate market.

The Sales Tax on Satellite Broadcasting Service

{¶ 5} Prior to 2003, Ohio did not tax sales of cable or satellite television service. That year, however, the General Assembly considered a bill that would have taxed sales of both services equally. H.B. No. 95, as introduced in the 125th General Assembly, proposed to enact R.C. 5739.01(B)(3)(q) to define “sale” as including “transactions by which * * * [cjable and satellite television service is or is to be provided.” As a result, the cable and satellite television industries retained lobbyists to protect their interests, and ultimately the legislature amended the bill to enact a sales tax on “satellite broadcasting service” alone. See R.C. 5739.01(B)(3)(p) (150 Ohio Laws, Part I, 396, and Part II, 1996). The General Assembly’s definition of “satellite broadcasting service” in R.C. 5739.01(XX) does *71 not include transactions involving the distribution of pay-television programming using ground receiving or distribution equipment, and the sale of cable television programming is therefore not subject to the tax.
Procedural History
{¶ 6} In response to this legislation, the satellite companies filed a declaratory-judgment complaint in the Franklin County Common Pleas Court seeking a declaration that the tax on sales of satellite television service but not on sales of cable television service had both the purpose and effect of favoring in-state economic interests in violation of the Commerce Clause.
{¶ 7} The trial court entered a partial summary judgment in favor of the satellite companies, declaring the sales tax on satellite broadcasting services to be unconstitutional because “[t]he differential tax treatment of [satellite and cable television providers] is directly correlated with whether they use certain local ground receiving and distribution equipment. * * * [T]he practical effect of the differential tax treatment is to benefit in-state economic interests while burdening out-of-state economic interests, thereby discriminating against interstate commerce in violation of the Commerce Clause * * *.” (Emphasis sic.)
{¶ 8} The trial court also concluded that a genuine issue of material fact existed regarding whether the General Assembly had intentionally discriminated against interstate commerce in levying the tax, and the court denied summary judgment on that issue. However, the court rejected the satellite companies’ argument that the sales tax facially discriminated against interstate commerce, a position the satellite companies have since abandoned.
{¶ 9} The tax commissioner appealed, and the Tenth District Court of Appeals reversed the judgment of the trial court and held that the Commerce Clause is not violated when the differential tax treatment of two categories of companies results solely from differences between the nature of their businesses, not from the location of their activities. DIRECTV v. Levin, 181 Ohio App.3d 92, 2009-Ohio-636, 907 N.E.2d 1242. The court explained that because both of these providers are engaged in interstate commerce, the sales tax did not discriminate against the interstate market for pay television, but merely against one interstate company competing in that market. Id. at ¶ 27-28. The appellate court further determined that the trial court erred in denying the tax commissioner’s motion for summary judgment on the issue of whether there was purposeful discrimination and directed the trial court to enter summary judgment for the tax commissioner on all claims. Id. at ¶ 35.
{¶ 10} We accepted the satellite companies’ discretionary appeal. DIRECTV, Inc. v. Levin, 122 Ohio St.3d 1454, 2009-Ohio-3131, 908 N.E.2d 945.

*72
Arguments on Appeal

{¶ 11} The satellite companies urge that the sales tax imposed by R.C. 5739.01(B)(3)(p) discriminates against interstate commerce in practice because the tax gives preferential treatment to “cable TV companies [that] have invested a fortune in building and maintaining a network of ‘ground receiving or distribution equipment’ — including thousands of buildings and tens of thousands of miles of cable — in Ohio,” while satellite service is taxed “because its providers have devised a way to deliver the same service without installing any ‘ground or receiving or distribution equipment’ in Ohio.” According to the satellite companies, a state may not distinguish between companies engaged in interstate commerce if the distinction turns on the extent of economic investment in the state, notwithstanding any differences in the manner in which the firms conduct business. Thus, they maintain that any discrimination in tax treatment that depends on the existence of ground receiving or distributing equipment in Ohio is unconstitutional.
{¶ 12} The satellite companies also assert that the court of appeals left undisturbed the trial court’s conclusion that a genuine issue of material fact remains regarding whether the General Assembly intentionally discriminated against them in enacting R.C. 5739.01(B)(3)(p), and they argue that statements made by lobbyists for the cable industry to legislators regarding the statute’s purpose and effect are relevant and admissible in proving discrimination against interstate commerce.
{¶ 13} The tax commissioner responds that the tax “simply differentiates between two forms of interstate commerce, not between a local economic activity and an out-of-state economic activity.” Tax differentials, he asserts, are not “prohibited simply because the business adversely affected by the tax treatment generates less economic activity in the subject state than the business that received favorable tax treatment.” The tax commissioner maintains that even if the tax technically discriminates against commerce, the sales tax may be “properly sustained as ‘compensatory’ or ‘complementary’ ” to the franchise fees imposed on cable companies. Also, he contends that the satellite companies have abandoned the issue of intentional discrimination.
{¶ 14} Accordingly, we are called upon to consider whether the sales tax levied by R.C. 5739.01(B)(3)(p) on satellite broadcasting services but not on cable broadcasting services discriminates against interstate commerce in violation of the Commerce Clause.
Law and Analysis

Standard of Review

{¶ 15} At the outset, we note that our review of a summary judgment is de novo. Comer v. Risko, 106 Ohio St.3d 185, 2005-Ohio-4559, 833 N.E.2d 712, ¶ 8. *73 “Summary judgment is appropriate if (1) no genuine issue of any material fact remains, (2) the moving party is entitled to judgment as a matter of law, and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and construing the evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the party against whom the motion for summary judgment is made.” State ex rel. Duncan v. Mentor City Council, 105 Ohio St.3d 372, 2005-Ohio-2163, 826 N.E.2d 832, ¶ 9.
{¶ 16} In determining whether a law discriminates against interstate commerce, the United States Supreme Court has “eschewed formalism for a sensitive, case-by-case analysis of purposes and effects.” W. Lynn Creamery, Inc. v. Healy (1994), 512 U.S. 186, 201, 114 S.Ct. 2205, 129 L.Ed.2d 157. Further, as the court explained in Hughes v. Oklahoma (1979), 441 U.S. 322, 336, 99 S.Ct. 1727, 60 L.Ed.2d 250, “[t]he burden to show discrimination rests on the party challenging the validity of the statute” — in this case, the satellite companies.

The Dormant Commerce Clause

{¶ 17} The United States Constitution provides that Congress shall have the power “[t]o regulate Commerce * * * among the several States.” Clause 3, Section 8, Article I. However, although the terms of the Commerce Clause “do not expressly restrain ‘the several States’ in any way,” the Supreme Court has “sensed a negative implication in the provision since the early days.” Kentucky Dept. of Revenue v. Davis (2008), 553 U.S. 328, 337, 128 S.Ct. 1801, 170 L.Ed.2d 685. Thus, the court has “long interpreted the Commerce Clause as an implicit restraint on state authority.” United Haulers Assn., Inc. v. Oneida-Herkimer Solid Waste Mgt. Auth. (2007), 550 U.S. 330, 338, 127 S.Ct. 1786, 167 L.Ed.2d 655. This concept of “negative implication” and “implicit restraint” is known as the “negative” or “dormant” Commerce Clause.
{¶ 18} The doctrine of the dormant Commerce Clause traces its roots to “[t]he desire of the Forefathers to federalize regulation of foreign and interstate commerce.” H.P. Hood & Sons, Inc. v. Du Mond (1949), 336 U.S. 525, 533, 69 S.Ct. 657, 93 L.Ed. 865. As the court explained in Camps Newfound/Owatonna, Inc. v. Harrison (1997), 520 U.S. 564, 571, 117 S.Ct. 1590, 137 L.Ed.2d 852, “During the first years of our history as an independent confederation, the National Government lacked the power to regulate commerce among the States. Because each State was free to adopt measures fostering its own local interests without regard to possible prejudice to nonresidents, what Justice Johnson characterized as a ‘conflict of commercial regulations, destructive to the harmony of the States,’ ensued.” Id., quoting Gibbons v. Ogden (1824), 22 U.S. (9 Wheat.) 1, 224, 6 L.Ed. 23 (Johnson, J., concurring).
{¶ 19} Accordingly, the modern cases arising under what has become known as the dormant Commerce Clause are “driven by concern about ‘economic protec *74 tionism — that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.’ ” Kentucky Dept. of Revenue, 553 U.S. at 337-338, 128 S.Ct. 1801, 170 L.Ed.2d 685, quoting New Energy Co. of Indiana v. Limbach (1988), 486 U.S. 269, 273-274, 108 S.Ct. 1803, 100 L.Ed.2d 302. The dormant Commerce Clause thus enshrines the economic policy of the framers to prohibit states from erecting barriers to free trade across state borders and from enacting laws that favor local enterprises at the expense of out-of-state businesses. Boston Stock Exchange v. New York State Tax Comm. (1977), 429 U.S. 318, 328-329, 97 S.Ct. 599, 50 L.Ed.2d 514.
{¶ 20} The Supreme Court has therefore recognized that “[n]o State, consistent with the Commerce Clause, may ‘impose a tax which discriminates against interstate commerce * * * by providing a direct commercial advantage to local business.’ ” (Ellipsis sic.) Id. at 329, quoting Northwestern States Portland Cement Co. v. Minnesota (1959), 358 U.S. 450, 458, 79 S.Ct. 357, 3 L.Ed.2d 421.
{¶ 21} The court has pointed out, however, that the Commerce Clause of the United States Constitution “protects the interstate market, not particular interstate firms” or “particular structured or methods of operation in a retail market.” Exxon Corp. v. Gov. of Maryland (1978), 437 U.S. 117, 127, 98 S.Ct. 2207, 57 L.Ed.2d 91. Therefore, differential tax treatment of “two categories of companies resulting] solely from differences between the nature of their businesses, [and] not from the location of their activities,” does not violate the dormant Commerce Clause. Amerada Hess Corp. v. Dir., Div. of Taxation, New Jersey Dept. of the Treasury (1989), 490 U.S. 66, 78, 109 S.Ct. 1617, 104 L.Ed.2d 58.
{¶ 22} Relying on the decisions of the United States Supreme Court in Exxon and Amerada Hess, every state and federal court considering Commerce Clause challenges brought by the satellite industry arguing against state tax measures as favoring the cable industry has held that these taxes do not violate the dormant Commerce Clause, because they do not discriminate against interstate commerce.
{¶ 23} In DIRECTV, Inc. v. Treesh (E.D.Ky.2006), 469 F.Supp.2d 425, the court considered a Kentucky tax statute that imposed a sales tax on both satellite and cable services but prohibited local governments from imposing franchise fees on cable companies while allowing cable companies a tax credit for the amount of any such fee imposed. The satellite companies claimed that allowing cable companies free access to public rights-of-way to install infrastructure within the state of Kentucky gave the cable companies a tax advantage not shared with satellite companies, whose service is provided through satellites located outside the state of Kentucky.
*75 {¶ 24} The district court dismissed the complaint, finding that the tax did not distinguish between in-state and out-of-state economic interests and had no discriminatory purpose or effect. The court noted that the cable companies could not be characterized as in-state interests and that “[t]he different effects of Kentucky’s new tax provisions on Satellite Companies and Cable Companies are owed not to the geographic location of the companies, but to their different delivery mechanisms,” explaining that the tax statute had the same effect regardless of whether the satellite or cable companies located their operations inside or outside the state. Id. at 437-438.
{¶ 25} The Sixth Circuit Court of Appeals affirmed and noted: “While a purpose of the [Kentucky tax statute] might have been to aid the cable industry rather than the satellite industry because the former has a larger in-state presence than the latter, there were clearly many other purposes including assessing some tax against a satellite industry that is rapidly growing * * (Emphasis sic.) DIRECTV v. Treesh (C.A.6, 2007), 487 F.3d 471, 480.
{¶ 26} The court went on to recognize that (1) cable and satellite companies provide consumers with two distinct services, “consisting of two very different means of delivering broadcasts,” id. at 480, (2) “the dormant Commerce Clause is intended to protect interstate commerce, and not particular firms engaged in interstate commerce, or the modes of operation used by those firms,” id. at 481, and (3) “differential tax treatment of ‘two categories of companies resulting] solely from differences between the nature of their businesses, [and] not from the location of their activities’ does not violate the dormant Commerce Clause.” Id., quoting Amerada Hess, 490 U.S. at 78, 109 S.Ct. 1617, 104 L.Ed.2d 58. The Sixth Circuit emphasized that “applying the dormant Commerce Clause in cases that do not present the equivalent of a protective tariff’ — i.e., where the tax does not draw geographic lines, favor local products, or promote local companies— would “dramatically increase the clause’s scope.” 487 F.3d at 481. The Supreme Court of the United States denied a writ of certiorari. See DIRECTV, Inc. v. Treesh (2008), 552 U.S. 1311, 128 S.Ct. 1876, 170 L.Ed.2d 746.
{¶ 27} In addition, the satellite companies challenged a North Carolina statute that imposed a sales tax on “direct-to-home satellite service” but not on cable television service. The North Carolina Court of Appeals rejected the Commerce Clause challenge, explaining that the tax “does not make any geographical distinctions, but merely describes one method of providing television programming services to North Carolina subscribers.” DIRECTV, Inc. v. State (2006), 178 N.C.App. 659, 663, 632 S.E.2d 543. Moreover, the tax “does not discriminate against [the satellite companies] in favor of a local industry [because] cable companies are no more ‘local’ in nature than are satellite companies.” Id. at 664. See also DIRECTV, Inc. v. Tolson (E.D.N.C.2007), 498 F.Supp.2d 784, 800, *76 affirmed (C.A.4, 2008), 513 F.3d 119 (dismissing the satellite companies’ complaint on other grounds, but explaining that the amended North Carolina statute imposing an equal tax on satellite and cable companies while revoking authority of local government to impose franchise fees does not violate the Commerce Clause).

The Ohio Sales Tax

{¶ 28} R.C. 5739.02 imposes a tax “on each retail sale made in this state.” R.C. 5739.01(B)(3)(p) defines “sale” to include “transactions for a consideration in any manner” by which “satellite broadcasting service is or is to be provided.” R.C. 5739.01(XX) further defines “satellite broadcasting service” to mean “the distribution or broadcasting of programming or services by satellite directly to the subscriber’s receiving equipment without the use of ground receiving or distribution equipment, except the subscriber’s receiving equipment or equipment used in the uplink process to the satellite.” (Emphasis added.) As the parties agree, the phrase “without the use of ground receiving or distribution equipment” clarifies that sales of cable broadcasting services are not subject to the tax.
{¶ 29} In reviewing the application of this statute to the facts here, we conclude that the sales tax imposed on satellite broadcasting services but not cable broadcasting services does not violate the Commerce Clause of the United States Constitution. The statute’s application depends on the technological mode of operation, not geographic location, and while it distinguishes between different types of interstate firms, it does not favor in-state interests at the expense of out-of-state enterprises. See DIRECTV, 487 F.3d at 480-481; DIRECTV, 469 F.Supp.2d at 437-438; DIRECTV, 498 F.Supp.2d at 800; DIRECTV, 178 N.C.App. at 663, 632 S.E.2d 543.
{¶ 30} Here, the tax applies to a transaction involving pay-television services depending only on the technological mode of distribution of those services. The General Assembly used the phrase “ground receiving or distribution equipment” in R.C. 5739.01(XX) to track the definition of “direct-to-home satellite service” set forth in the notes to Section 152, Title 47, U.S.Code, which authorize states to tax satellite-television service. See Pub.L. No. 104-104, Title VI, Section 602(b)(1), 110 Stat. 144 (1996). The General Assembly defined “satellite broadcasting service” to correspond with this federal authorization and to identify the taxable transaction by the method of distributing pay-television services, not to protect companies that have invested in a ground distribution system or to encourage investment in such a system.
{¶ 31} Application of the sales tax does not depend on the geographic location of the programming provider. Rather, the sale of satellite broadcasting services is subject to tax regardless of whether the provider is an in-state or out-of-state business and without considering the amount of local economic activity or *77 investment in facilities that the satellite companies bring to Ohio. A satellite company that is headquartered in Ohio, builds its uplink in Ohio, employs only Ohio residents, and provides programming only to Ohio customers is as responsible for collecting the tax as any out-of-state company providing the same services using the same mode of distribution.
{¶ 32} Conversely, the cable industry is not a local interest benefited at the expense of out-of-state competitors. Like the satellite companies, the major cable providers are interstate companies selling an interstate product to an interstate market. Both the satellite and cable industries serve customers in Ohio, own property in Ohio, and employ residents of Ohio, but no major pay-television provider is headquartered in Ohio or could otherwise be considered more local than any other. Thus, the sales tax does not reflect “differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.” Oregon Waste Sys., Inc. v. Oregon Dept. of Environmental Quality (1994), 511 U.S. 93, 99, 114 S.Ct. 1345, 128 L.Ed.2d 13. Rather, the tax regulates among these interests even-handedly based on the technological mode of operation.
{¶ 33} The cases on which the satellite companies rely are distinguishable. In Granholm v. Heald (2005), 544 U.S. 460, 125 S.Ct. 1885, 161 L.Ed.2d 796, the states of Michigan and New York imposed regulations allowing in-state, but not out-of-state, wineries to make direct sales to customers, while in Bacchus Imports, Ltd. v. Dias (1984), 468 U.S. 263, 104 S.Ct. 3049, 82 L.Ed.2d 200, the state of Hawaii excepted certain alcoholic beverages using locally produced ingredients from the state liquor tax. In Armco Inc. v. Hardesty (1984), 467 U.S. 638, 104 S.Ct. 2620, 81 L.Ed.2d 540, the state of West Virginia imposed a wholesale tax on goods manufactured out of state but not on goods made in state, and in Westinghouse Elec. Corp. v. Tully (1984), 466 U.S. 388, 390, 104 S.Ct. 1856, 80 L.Ed.2d 388, the state of New York gave a tax credit only to those corporations whose subsidiaries exported goods from New York. And in Boston Stock Exchange, 429 U.S. at 328-329, 97 S.Ct. 599, 50 L.Ed.2d 514, the state imposed a greater tax liability on out-of-state transactions than on in-state transactions.
{¶ 34} In those cases, the states acted to protect local interests at the expense of out-of-state competitors. In sharp contrast, the Ohio tax does not protect local industries or treat in-state companies differently from out-of-state companies, nor does it provide a tax incentive for companies to move operations or direct business to Ohio.
{¶ 35} Therefore, we concur with those courts that have considered the merits of the satellite companies’ dormant Commerce Clause claims and conclude that the Ohio sales tax on satellite broadcasting services does not discriminate against *78 interstate commerce in violation of the Commerce Clause of the United States Constitution.

The Admissibility of Lobbyist Statements

{¶ 36} The satellite companies assert that statements made by lobbyists for the cable industry are admissible to prove both the practical effect of the sale tax and the intent of the General Assembly in enacting it. We need not reach the merits of this claim.
{¶ 37} Assuming for purposes of this argument that the statements would be admissible to prove the discriminatory effect of the sales tax, these statements would not affect our conclusion that the sales tax does not discriminate against commerce in practical effect.
{¶ 38} And to the extent that the satellite companies rely on the lobbyist statements to show that the General Assembly passed the sales tax with a discriminatory intent, we are unable to reach that issue because the satellite companies failed to preserve their intentional-discrimination claim for our review. Here, the court of appeals reversed the trial court’s decision to deny summary judgment in favor of the tax commissioner on the claim that the state purposefully discriminated against interstate commerce, ordering “the trial court to enter summary judgment for defendant-appellant Richard A. Levin, Tax Commissioner of Ohio” and ending this litigation subject only to appeal. DIRECTV, 181 Ohio App.3d 92, 2009-Ohio-636, 907 N.E.2d 1242, ¶ 6, 29, and 35.
{¶ 39} However, in their memorandum in support of jurisdiction in this court, the satellite companies did not argue that the court of appeals erred by ordering summary judgment for the tax commissioner on this issue. They sought review only of the evidentiary issue regarding whether evidence of lobbyist statements is relevant and admissible. Not only did the satellite companies fail to attack the order directing summary judgment against them in their initial brief filed here, but they also asserted that the appellate court had not actually ruled against them on this point.
{¶ 40} By failing to challenge the decision granting summary judgment in favor of the tax commissioner on the intentional-discrimination claim in either their memorandum in support of jurisdiction or their initial brief, the satellite companies failed to preserve that claim for review. See, e.g., Estate of Ridley v. Hamilton Cty. Bd. of Mental Retardation & Dev. Disabilities, 102 Ohio St.3d 230, 2004-Ohio-2629, 809 N.E.2d 2, ¶ 18 (declining to consider issues not set forth in the appellant’s memorandum in support of jurisdiction); Utility Serv. Partners, Inc. v. Pub. Util. Comm., 124 Ohio St.3d 284, 2009-Ohio-6764, 921 N.E.2d 1038, ¶ 54 (explaining that the appellant “failed to preserve” an argument “raised for the first time on reply”). Accordingly, we decline to address this issue.
*79 Conclusion
{¶ 41} Differential tax treatment of two categories of companies resulting solely from differences between the nature of their businesses, not from the location of their activities, does not violate the Commerce Clause of the United States Constitution. The Ohio General Assembly imposed a sales tax that makes no distinction between local and interstate commerce, but rather distinguishes based only on the mode of distributing television programming. For these reasons, the judgment of the court of appeals is affirmed.
Judgment affirmed.
Lundberg Stratton, O’Connor, Lanzinger, and Cupp, JJ., concur.
Brown, C.J., and Pfeifer, J., dissent.