**DIRECTV, INC., et al.**

v.

**Richard H. ROBERTS, Commissioner of Revenue, State of Tennessee**

Court of Appeals of Tennessee, AT NASHVILLE.

Filed February 27, 2015.

Application for Permission to Appeal Denied by Supreme Court: June 12, 2015

Robert E. Cooper, Jr., Attorney General and Reporter; Joseph F. Whalen, Associate Solicitor General; and Mary Ellen Knack, Senior Counsel, for the appellant, Richard H. Roberts,[1] Commissioner of Revenue.

Stephen J. Jasper, Nashville, Tennessee; E. Joshua Rosenkranz and Jeremy N. Kudon, New York, New York; and Eric A.

1. In accordance with Tenn. R.App. P. 19(c), Richard H. Roberts, the current Commissioner of Revenue, has been substituted for his predecessors.

Shumsky, Washington, D.C., for the appellees, DIRECTV, Inc. and DISH Network L.L.C.

Carolyn W. Schott and Andrée Sophia Blumstein, Nashville, Tennessee, and John A. Hinman, San Francisco, California, for the Amicus Curiae, National Association of Wine Retailers.

Joseph F. Welborn, III, Nashville, Tennessee, for the Amicus Curiae, Satellite Broadcasting & Communications Association.

Brett R. Carter, Nashville, Tennessee, and Eric S. Tresh and Zachary T. Atkins, Atlanta, Georgia, for the Amicus Curiae, Tennessee Cable Telecommunications Association, Inc.

## OPINION

W. Neal McBrayer, J., delivered the opinion of the Court, in which Frank G. Clement, Jr., P.J., M.S., and Andy D. Bennett, J., joined.

Plaintiffs contend that the sales tax law unconstitutionally discriminates against satellite television providers. The law taxes the entire subscription fee billed to satellite customers while the first $15 of the subscription fee billed to cable customers is exempt. On cross-motions for summary judgment, the trial court found the sales tax law violated the Commerce Clause of the United States Constitution. The Commissioner of Revenue appeals. Because we find that satellite providers and cable providers are not similarly situated for purposes of the Commerce Clause, we reverse.

**2.** Except as otherwise indicated, the facts are taken from the parties' statements of material facts. In some instances, the facts are undisputed only for the purposes of ruling on the motions for summary judgment. *See* Tenn. R. Civ. P. 56.03.

## I. FACTS AND PROCEDURAL HISTORY[2]

Plaintiffs DIRECTV, Inc. ("DIRECTV") and EchoStar Satellite Corporation, now known as DISH Network L.L.C. ("DISH"), provide direct-to-home satellite television service. Satellite providers DIRECTV and DISH compete for subscribers with cable providers. The competitors are similar in several respects. Satellite providers, like cable providers, secure television programming by negotiating with programmers to obtain the rights to distribute programming content. Both use retailers, websites, and call centers to sell their programming packages to customers. Both provide their subscribers with equipment that receives and converts programming signals into content that can be viewed at the subscriber's home and rely upon technicians to install and service the home equipment. Both satellite providers and cable providers offer an array of programming packages for which they bill their subscribers monthly.

The major satellite providers and major cable providers are interstate enterprises. DIRECTV is a California corporation headquartered in El Segundo, California, and DISH is a Nevada corporation headquartered in Englewood, Colorado. Major cable providers include Delaware corporation Time Warner Cable, which is headquartered in New York, New York; Pennsylvania corporation Comcast, which is headquartered in Philadelphia, Pennsylvania;[3] and Delaware corporation Charter Communications, which is headquartered

**3.** Joint Application of Comcast Corp. and Time Warner Cable Inc. for Consent Pursuant to Section 214 of the Communications Act of 1934, as Amended, to Transfer Control of Subsidiaries of Time Warner Cable, Inc., Federal Communications Commission, MB Docket No..

in Stamford, Connecticut.[4]

## A.   PROGRAM ASSEMBLY AND DELIVERY BY SATELLITE AND CABLE PROVIDERS

Although satellite and cable providers have similarities, the manner in which they assemble and deliver programming to customers is very different. The different approaches to assembly and delivery of programming result in differing infrastructure requirements. Satellite providers collect and assemble program signals at uplink facilities located outside of Tennessee. Each of the facilities has its own farm of satellite dishes, studio equipment, and staff of trained employees. From the uplink facilities, the satellite providers digitize, process, and compress the program signals; convert them into radio frequencies; and transmit them to their satellites. The two largest uplink facilities used by DIRECTV are located in Colorado and California. DISH's two largest uplink facilities are located in Wyoming and Arizona.

Satellites in geostationary orbits above the Earth receive the signals from the uplink facilities. From the satellites, the programming signals are beamed back down to Earth directly to customers. The customers receive the signals by means of a receiving dish mounted on or near their homes.

In contrast to satellite providers, cable providers collect and assemble program signals at distribution points called "headends." Over eighty headends are located in Tennessee. The typical headend is a building surrounded by several large satellite dishes. The satellite dishes collect programming signals and then direct them to receivers located within the headend building. Employees then modulate the

signals and insert local programming and advertising.

From the headends, signals travel through underground "trunk" lines and then are distributed through "hubs" and/or "nodes" into "feeder" or distribution lines. Hubs and nodes are physical buildings or cabinet devices that are installed in each neighborhood. The program signals reach customers from "drop lines," which are connected to small boxes along the distribution lines or "taps." The signal can be viewed on any television connected to a cable set-top box.

The different approaches to program assembly and distribution, besides demanding different levels of in-state infrastructure, produce differing in-state economic impacts. Cable providers have invested over $1 billion to build, service, and maintain their in-state distribution system of headend buildings and miles of cable. They also employ over 4,000 Tennessee residents, many in connection with the assembly and distribution of programming.

DIRECTV and DISH, on the other hand, either directly or through affiliates, lease space in Tennessee to provide office support for installation technicians and storage of installation-related equipment. They also lease space in Tennessee for the collection of local television signals for rebroadcast to their subscribers. DIRECTV has an ownership interest in an office building in Tullahoma, Tennessee. As of 2010, DIRECTV had 493 Tennessee employees. At the same point in time, DISH had no Tennessee employees, but an affiliated company employed 239 Tennesseans to perform installation services.

## B.   TAXATION OF SATELLITE AND CABLE SUBSCRIPTION FEES

Historically, Tennessee has taxed cable and satellite services differently. In 1984,

4.   Charter Commc'ns, Inc., Current Report (Form 8–K) (Feb. 5, 2015).

the Legislature enacted Public Chapter 13, which imposed an amusement tax on cable television subscription charges in excess of "those charges made for the basic or lowest rate charged by the supplier" of such services." 1984 Tenn. Pub. Acts 75–76 (ch. 13 § 1). After initially determining such services were not subject to sales or use tax, starting in 1994, the Department of Revenue began taxing satellite as a telecommunications service. *See HBO Direct, Inc. v. Johnson,* No. 01A01–9804–CH–00221, 1999 WL 452317, at *3 (Tenn.Ct. App. July 1, 1999). By 1998, the amusement tax rate and the tax rate for telecommunications services were the same, but customers of satellite providers did not enjoy an exemption for basic service.

In 1999, Tennessee removed cable services from the amusement category and began treating subscription fees charged by cable and satellite providers as a taxable privilege, subject to sales tax. 1999 Tenn. Pub. Acts 1030–32 (ch. 423). The Legislature created a three-tiered taxing structure for cable television services and a single-tiered taxing structure for satellite services. *Id.* For cable services, rather than exempting "the basic or lowest rate charged" by the cable provider, the State exempted charges or fees less than $15.00. *Id.* The State taxed cable services of $15.00 or more, but not exceeding $27.50, at the rate of 8.25%. *Id.* Cable charges or fees in excess of $27.50 were subject to the state tax rate of 6% plus a local option tax of up to 2.75%. *Id.* For satellite services, the State taxed subscription fees at the rate of 8.25% with no exemption.[5] *Id.*

The three-tiered taxing structure for cable television services and the single-tiered taxing structure for satellite services have remained in effect until the present, except the state tax rate for cable charges or fees in excess of $27.50 is now 7% plus a local option tax. Tenn Code Ann. §§ 67–6–103(f), –202(a), –226, –227, –714 (2013). Cable customers continue to receive an exemption from the sales tax on the first $15.00 of monthly charges, while satellite customers do not. *Id.* §§ 67–6–103(f), –226, –227.

### C. Proceedings Below

In August 2003, DIRECTV and DISH filed a complaint against the Commissioner of Revenue seeking a refund of sales and use taxes paid since January 1, 2002.[6] DIRECTV and DISH alleged that the sales tax on satellite television services violated the Commerce Clause and the Equal Protection Clause of the United States Constitution, as well as the equal protection guarantee of the Tennessee Constitution.

The parties filed cross-motions for summary judgment. Following a hearing, the trial court entered an order granting DIRECTV's and DISH's motion for summary judgment and denying the Commissioner's motion. The trial court concluded that the exemption on the first $15.00 of monthly charges granted to cable—but not satellite—customers, violated the dormant or negative Commerce Clause of the United States Constitution. According to the court, the undisputed facts showed that: "1) the cable tax exemption taxes virtually identical retail transactions among compet-

---

5. Satellite providers are exempt from local option taxes. *See* Telecommunications Act of 1996, Pub.L. No. 104–104, Title VI, § 602, 110 Stat. 144 (reprinted at 47 U.S.C. § 152) (historical notes and statutory notes).

6. If an assessment of taxes is believed to be "unjust, illegal or incorrect," a taxpayer "may pay the tax and file claim for refund of the tax." Tenn.Code Ann. § 67–1–1801(a)(1) (Supp.2014). In this case, the Commissioner waived the claim for refund requirement to permit DIRECTV and DISH to file suit directly. *See id.* § 67–1–1802(c)(3) (Supp. 2014).

itors differently; 2) the tax exemption ... has the actual effect of substantially favoring the cable industry over the satellite industry; and 3) the cable industry has a significantly larger Tennessee footprint than does the satellite industry."

The trial court rejected the equal protection challenges to the tax structure. The court first noted that the equal protection guarantee of the State Constitution afforded essentially the same protections as the Equal Protection Clause of the federal Constitution. Then, applying a rational basis test, the court found that the separate sales tax structures for cable and satellite services bore a reasonable relationship to a legitimate state interest.

On appeal, the Commissioner raises a single issue for review. Specifically, the Commissioner asserts the trial court erred in finding that the sales tax exemption on the first $15.00 in monthly fees charged by cable providers "violates the dormant Commerce Clause ... when the differential treatment results from differences in the nature of their businesses, not the location of their activities, and when the trial court found that a rational, non-discriminatory basis existed for the differential treatment." DIRECTV and DISH raise an additional issue for review. They assert that, not only does the exemption discriminate in actual effect, but it was also enacted with a discriminatory purpose.

## II. STANDARD OF REVIEW

The requirements for a grant of summary judgment are well known. Summary judgment may be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

Tenn R. Civ. P. 56.04; *see also Martin v. Norfolk S. Ry. Co.*, 271 S.W.3d 76, 83 (Tenn.2008); *Penley v. Honda Motor Co.*, 31 S.W.3d 181, 183 (Tenn.2000); *Byrd v. Hall*, 847 S.W.2d 208, 215 (Tenn.1993). The party moving for summary judgment bears the burden of demonstrating both that no genuine dispute of material fact exists and that it is entitled to a judgment as a matter of law. *Martin*, 271 S.W.3d at 83.

When considering cross-motions for summary judgment, the trial court "must rule on each party's motion on an individual and separate basis." *CAO Holdings, Inc. v. Trost*, 333 S.W.3d 73, 83 (Tenn. 2010).

With regard to each motion, the court must determine (1) whether genuine disputes of material fact with regard to that motion exist and (2) whether the party seeking the summary judgment has satisfied Tenn. R. Civ. P. 56's standards for a judgment as a matter of law. Therefore, in practice, a cross-motion for summary judgment operates exactly like a single summary judgment motion.

*Id.* (citations omitted). For the respective competing motions, the trial court must view the evidence in the light most favorable to the opposing party and draw all reasonable inferences in the opposing party's favor. *See Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn.1997). The court is not to "weigh" the evidence when evaluating a motion for summary judgment, or substitute its judgment for that of the trier of fact. *Martin*, 271 S.W.3d at 87; *Byrd*, 847 S.W.2d at 211. The denial of a cross-motion for summary judgment does not necessitate the granting of the competing cross-motion. *CAO Holdings, Inc.*, 333 S.W.3d at 83.

A trial court's decision on a motion for summary judgment enjoys no presumption of correctness on appeal. *Martin*, 271

S.W.3d at 84; *Blair v. W. Town Mall*, 130 S.W.3d 761, 763 (Tenn.2004). We review the summary judgment decision as a question of law. *Martin*, 271 S.W.3d at 84; *Blair*, 130 S.W.3d at 763. Accordingly, this Court must review the record de novo and make a fresh determination of whether the requirements of Tenn. R. Civ. P. 56 have been met. *Eadie v. Complete Co.*, 142 S.W.3d 288, 291 (Tenn.2004); *Blair*, 130 S.W.3d at 763.

## III. ANALYSIS

The Commerce Clause of the United States Constitution empowers Congress "[t]o regulate Commerce ... among the several States....." U.S. Const. art. I, § 8, cl. 3. The United States Supreme Court has interpreted the Clause to empower the Federal Government and, by implication, to limit the states. *Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me.*, 520 U.S. 564, 571, 117 S.Ct. 1590, 137 L.Ed.2d 852 (1997); *S.C. State Highway Dep't v. Barnwell Bros.*, 303 U.S. 177, 184-85, 58 S.Ct. 510, 82 L.Ed. 734 (1938). This implied limitation on state power is known as the "negative" or "dormant" Commerce Clause. *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 287, 117 S.Ct. 811, 136 L.Ed.2d 761 (1997).

Negative Commerce Clause jurisprudence has never been a model of clarity or stability. As conceded by the Supreme Court in the 1940's, the Commerce Clause's limitation on state power is both implied and

> open to different implications of meaning. And this accounts largely for variations in this field continuing almost from the beginning until now. They started with Marshall and Taney, went forward from Waite to Fuller, and have been projected in later differences perhaps less broad, but hardly less controversial. Consequently in its prohibitive, as in its affirmative or enabling, effects the histo-

ry of the commerce clause has been one of very considerable judicial oscillation. *Prudential Ins. Co. v. Benjamin*, 328 U.S. 408, 418-20, 66 S.Ct. 1142, 90 L.Ed. 1342 (1946) (footnotes omitted). The judicial oscillation has continued since the 1940's. *See Nw. States Portland Cement Co. v. Minnesota*, 358 U.S. 450, 457, 79 S.Ct. 357, 3 L.Ed.2d 421 (1959) ("The resulting judicial application of constitutional principles to specific state statutes leaves much room for controversy and confusion and little in the way of precise guides to the States in the exercise of their indispensable power of taxation."); Brannon P. Denning, *Reconstructing the Dormant Commerce Clause Doctrine*, 50 Wm. & Mary L.Rev. 417, 428 (2008) ("[E]ven a brief tour d'horizon of the [dormant Commerce Clause doctrine's] evolution ... will show that the Court has reeled from one set of decision rules to another."). The fact that the negative Commerce Clause doctrine is still susceptible to "different implications of meaning" can be seen in the criticism of the doctrine by current members of the Supreme Court, *see, e.g.*, *Camps Newfound/Owatonna, Inc.*, 520 U.S. at 610, 117 S.Ct. 1590 (Thomas, J., dissenting) ("The negative Commerce Clause has no basis in the text of the Constitution, makes little sense, and has proved virtually unworkable in application."); *Tyler Pipe Industries, Inc. v. Washington State Department of Revenue*, 483 U.S. 232, 260, 107 S.Ct. 2810, 97 L.Ed.2d 199 (1987) (Scalia, J., concurring in part and dissenting in part) ("[O]ur applications of the [negative Commerce Clause] doctrine have, not to put too fine a point on the matter, made no sense."), and others who find the negative Commerce Clause to be "a horrid mess in application." *See* Michael S. Greve, *The Dormant Coordination Clause*, 67 Vand. L.Rev. En Banc 269, 270 (2014), available at http://www.vanderbiltlawreview.org/content/articles/2014/11/The–Dormant–Coordination–Clause.pdf.

■ Yet, despite the judicial oscillation, confusing results, and criticism, the decisional rule applicable to Commerce Clause challenges of state taxes has remained the same since 1977.[7] State taxes are upheld "against [a negative] Commerce Clause challenge when the tax is applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State." *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 279, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977). Both motions for summary judgment focused on the discrimination component of the decisional rule.[8] A tax discriminates against interstate commerce when it "tax[es] a transaction or incident more heavily when it crosses state lines than when it occurs entirely within the State." *Armco Inc. v. Hardesty*, 467 U.S. 638, 642, 104 S.Ct. 2620, 81 L.Ed.2d 540 (1984). Such discrimination may appear "(a) facially, (b) purposefully, or (c) in practical effect." *E. Ky. Res. v. Fiscal Court of Magoffin Cnty., Ky.*, 127 F.3d 532, 540 (6th Cir.1997). DIRECTV and DISH claim that the sales tax on satellite television services discriminates both purposefully and, as found by the trial court, in practical effect.

## A. CHALLENGES TO DISPARATE TAXATION OF SATELLITE AND CABLE PROVIDERS

■ As the Commissioner hastens to point out, this case does not represent the first Commerce Clause challenge by satellite providers to state tax schemes that treat satellite providers and cable providers differently. However, where these challenges have resulted in final decisions, the cases, all of which reject the satellite providers' position, do not necessarily aid this Court. First, in examining alleged barriers to interstate commerce, we must look past form and conduct "a sensitive, case-by-case analysis of purposes and effects" of the challenged tax. *W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 201, 114 S.Ct. 2205, 129 L.Ed.2d 157 (1994). For example, a tax, which on its own is constitutional, may be unconstitutional in combination with a subsidy. *Id.* at 200, 114 S.Ct. 2205. Second, the analysis found in some of the decisions can be seen as difficult to square with negative Commerce Clause precedent.

In 2010, the Ohio Supreme Court considered whether a sales tax on "satellite broadcasting service" violated the negative Commerce Clause. *DIRECTV, Inc. v. Levin*, 128 Ohio St.3d 68, 941 N.E.2d 1187, 1191 (2010). The definition of "satellite broadcasting service" excluded "transactions involving the distribution of pay-television programming using ground receiving or distribution equipment," so cable services were not subject to the sales tax. *Id.* The satellite providers filed a declaratory-judgment action arguing that the sales tax discriminated facially, purposeful-

---

7. The decisional rule has remained the same, but there have been qualifiers. For instance, a discriminatory tax may survive a negative Commerce Clause challenge "if it is a valid 'compensatory tax' designed simply to make interstate commerce bear a burden already borne by intrastate commerce." *Associated Indus. of Mo. v. Lohman*, 511 U.S. 641, 647, 114 S.Ct. 1815, 128 L.Ed.2d 639 (1994). There have also been detractors. *See Okla. Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 201, 115 S.Ct. 1331, 131 L.Ed.2d 261 (1995) (Scalia, J., concurring) (describing the four-part test as "eminently unhelpful.")

8. DIRECTV and DISH do not limit their negative Commerce Clause challenge to the assertion that the tax is discriminatory. In their complaint, they also allege that the "sales tax on satellite operators is not fairly related to the services provided by the State."

ly, and in practical effect. *Id.* The trial court found that the tax had the practical effect of discriminating against out-of-state economic interests to benefit in-state economic interests and granted partial summary judgment on that issue. *Id.* The court of appeals reversed and directed entry of a judgment in favor of the tax commissioner on all issues. *Id.*

In affirming the court of appeals, the supreme court concluded that the sales tax did not violate the negative Commerce Clause. *Id.* at 1196. The court rested this conclusion upon two grounds. First, the court found the tax statute could permissibly rely upon the differences in the way satellite and cable providers deliver and assemble programing.

> The statute's application depends on the technological mode of operation, not geographic location, and while it distinguishes between different types of interstate firms, it does not favor in-state interests at the expense of out-of-state enterprises.
>
> Here, the tax applies to a transaction involving pay-television services depending only on the technological mode of distribution of those services....
>
> Application of the sales tax does not depend on the geographic location of the programming provider. Rather, the sale of satellite broadcasting services is subject to tax regardless of whether the provider is an in-state or out-of-state business and without considering the amount of local economic activity or investment in facilities that the satellite companies bring to Ohio.

*Id.* at 1195 (citations omitted). Second, as suggested by the reference to "interstate firms" above, the court found no benefit to in-state economic interests at the expense of out-of-state competitors.

> [T]he cable industry is not a local interest benefitted at the expense of out-of-

state competitors. Like the satellite companies, the major cable providers are interstate companies selling an interstate product to an interstate market. Both the satellite and cable industries serve customers in Ohio, own property in Ohio, and employ residents of Ohio, but no major pay-television provider is headquartered in Ohio or could otherwise be considered more local than any other.

*Id.* at 1196.

In 2006, a North Carolina court addressed the same situation as in *DIRECTV, Inc. v. Levin.* Like Ohio, North Carolina imposed a sales tax on direct-to-home satellite service but not on cable television service. *DIRECTV, Inc. v. State,* 178 N.C.App. 659, 632 S.E.2d 543, 546 (N.C.Ct.App.2006). The satellite providers contended that the tax statute discriminated both "on its face and in its practical effect." *Id.* at 663, 632 S.E.2d 543. On cross-motions for summary judgment, the trial court granted the State's motion and dismissed the satellite providers' complaint. *Id.* at 661, 632 S.E.2d 543. The North Carolina Court of Appeals affirmed. *Id.* at 660, 632 S.E.2d 543.

In affirming, the North Carolina court cited very similar grounds to those relied upon by the Ohio Supreme Court. The court "conclude[d] that the dormant Commerce Clause prohibits discrimination against the interstate marketing for multichannel video programming, but that it does not necessarily prohibit discrimination against programmers in that market who deliver programming by satellite as opposed to cable." *Id.* at 667, 632 S.E.2d 543. The court also concluded:

> [C]able companies are no more "local" in nature than are satellite companies. Indeed, the record reveals that both businesses are interstate in nature, as they

both utilize in-state and out-of-state equipment and facilities in providing service to North Carolina subscribers and both own property within the State of North Carolina. Thus, ... neither satellite companies nor cable companies are properly characterized as an in-state or out-of-state economic interest.

*Id.* at 664, 632 S.E.2d 543.

A third decision, by the United States Court of Appeals for the Sixth Circuit, is the least analogous to the facts before us. The case involved Kentucky tax credits available to cable providers but not satellite providers. *DIRECTV, Inc. v. Treesh,* 487 F.3d 471, 475 (6th Cir.2007). Both cable and satellite services were subject to a 3% state excise tax, and cable and satellite providers paid a 2.4% state tax on gross revenues from Kentucky sales. *Id.* Kentucky law also prohibited local governments from levying any franchise fee or tax on multichannel video programming service, but if a multichannel video programming provider paid such a local fee or tax, it could receive a credit against the state tax. *Id.*

Satellite providers complained that the tax structure violated the negative Commerce Clause in practical effect. *Id.* at 478. Because satellite providers are exempt from local taxes as a matter of federal law, only cable providers could receive the tax credit. Satellite providers also objected that cable providers were relieved from paying franchise fees to access local rights-of-way, which are required for cable but not for satellite service. *Id.* at 475–76.

The court of appeals rejected the satellite providers' arguments, affirming dismissal of their complaint. *Id.* at 481. The court noted that states and local governments were "under no mandate to charge for the use of local rights-of-way" and forgoing such fees would not violate the Commerce Clause even if there was some benefit to local interests. *Id.* at 479. There was also no direct subsidy to cable providers, rather cable providers only received the right to conduct business without local taxation or fees. *Id.* at 480. However, perhaps echoing *DIRECTV, Inc. v. State* or previsioning *DIRECTV, Inc. v. Levin,* the court also noted that the "goods" involved were "distinct, consisting of two very different means of delivering broadcasts." *Id.*

As argued by DIRECTV and DISH in this case, to the extent any of these decisions can be read as authorizing taxes that discriminate against interstate commerce where the differential treatment is based upon operational differences, they undermine negative Commerce Clause precedent.[9] Because taxes may discriminate by intent or in practical effect as well as facially, it stands to reason that distinctions other than location or geography may conceal discrimination against interstate commerce. Operational differences can be, and in this case are, linked to geography. By using cable, rather than satellites, to reach their customers, cable providers make greater use of Tennessee infrastructure. Where operational differences and geography are linked, the negative Commerce Clause does not permit favoritism to local interests at the expense of out-of-state interests, even where the challenged tax scheme discriminates only by reference to operational differences. *See, e.g., Bacchus Imports Ltd. v. Dias,* 468 U.S. 263, 272–73, 104 S.Ct. 3049, 82 L.Ed.2d 200 (1984) (holding tax exemption only for wine and liquor produced from a

9. A fuller discussion of this point may be found in Brief Amici Curiae of Constitutional Law Professors in Support of Petitioners at 13–19, *DIRECTV, Inc. v. Levin,* 133 S.Ct. 51 (2012) (No. 10–1322).

native plant or fruit violates negative Commerce Clause).

In addition, the fact that the parties benefitting from a tax are themselves interstate companies does not shield the tax from negative Commerce Clause review. Both *DIRECTV, Inc. v. State* and *DIRECTV, Inc. v. Levin* note that cable providers are not in-state economic interests. *Levin*, 941 N.E.2d at 1196; *State*, 632 S.E.2d at 548. However, "[a] State may no more use discriminatory taxes to assure that nonresidents direct their commerce to businesses within the State than to assure that residents trade only in intrastate commerce." *Boston Stock Exch. v. State Tax Comm'n*, 429 U.S. 318, 334–35, 97 S.Ct. 599, 50 L.Ed.2d 514 (1977). Taxation "that discriminates between two types of interstate transactions in order to favor local commercial interests over out-of-state businesses ... is constitutionally impermissible." *Id.* at 335, 97 S.Ct. 599. As noted by the dissent in *DIRECTV, Inc. v. Levin*, "a business need not be locally owned or headquartered to benefit the local economy." *Levin*, 941 N.E.2d at 1198 (Brown, C.J., dissenting). Therefore, despite any implication to the contrary in either *DIRECTV, Inc. v. State* or *DIRECTV, Inc. v. Levin*, the negative Commerce Clause has been interpreted to protect against favoritism to local investment as well as to local businesses. *C & A Carbone, Inc. v. Clarkstown*, 511 U.S. 383, 392, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994).

What negative Commerce Clause precedent does not explain is how state legislatures are to weigh variances in investment in order to avoid favoritism. DIRECTV and DISH argue that "Tennessee's tax scheme ... tilts the playing field in favor of pay-TV providers that incur infrastructure expenses within the state." While they may have no or nearly no infrastruc-

ture investment in Tennessee, satellite providers invest in Tennessee in other ways. Satellite providers have employees and facilities in Tennessee supporting dish installation activities. Case law does not explain what differential, either in value or type, of local investment will render different treatment of competing companies discriminatory for purposes of the negative Commerce Clause.

B. HISTORY OF TAXATION OF SATELLITE AND CABLE PROVIDERS BY TENNESSEE

As quick as the Commissioner is to point out the prior unsuccessful court challenges by the satellite providers, DIRECTV and DISH are equally ready to point to the history surrounding the 1999 legislation that was the genesis of the current tax structure. As originally filed, the bill subjected all pay-television services, including cable and satellite, to an 8.25% tax on charges in excess of $12.00 per month. A bill summary prepared by the Department of Revenue identified the different sales tax treatment for paid television services as a problem and stated that the "bill will ensure that all paid television providers are treated equally, regardless of the technology used."

Representatives from the cable industry objected to the proposed legislation. In meetings with the Department of Revenue and state legislators, cable representatives argued that cable providers were more deserving of a tax exemption than satellite providers and emphasized the monies invested in the state, the residents employed, and the local taxes paid by cable providers. Cable providers also stressed their payment of state franchise and excise taxes.

Ultimately, the 1999 legislation was amended to exempt from tax the first $15.00 per month for cable services. The exemption for satellite services was re-

moved entirely. The legislation as amended passed and became law. 1999 Tenn. Pub. Acts 1030–32 (ch. 423).

According to DIRECTV and DISH, what occurred with tax reform for satellite and cable services during the 1999 legislative session could be summed up by a newspaper article appearing in August of that year. In the article, a deputy commissioner for the Department of Revenue confirmed that "[i]n . . . [the] original bill, satellite television customers got the same sales tax exemption that cable companies got, 'but by the time the cable people were through with it, they (satellite customers) got no exemption.' "[10] Later in the article, a lobbyist for the cable industry explained that the differing tax treatment was justified because "cable companies 'have millions of dollars invested in Tennessee, we pay local governments for the use of their right of way, those are costs that those other entities don't have.' "[11]

Although often noted in the context of statutory construction, it also seems appropriate to proceed with caution here because "[l]egislative records are not always distinguished for their candor and accuracy." *BellSouth Telecomms., Inc. v. Greer,* 972 S.W.2d 663, 673 (Tenn.Ct.App.1997). Further, the motive behind legislative statements must be considered. "Rather than reflecting the issues actually debated by the legislature, legislative history frequently consists of self-serving statements favorable to particular interest groups prepared and included in the legislative record solely to influence the courts' interpretation of the statute." *Id.* at 673–74. It is also not difficult to imagine self-serving statements favorable to particular interest groups included in the legislative record

solely to curry favor with those interest groups.

The legislative statements of one member or group of members also can not be reliably attributed to all members. Some even question whether a single motive can ever be attributed to legislation.

> Legislators do not have common objectives, so the basis for imputing agreement to them is weaker than the foundation for this technique in private law. . . . Statutes are drafted by multiple persons, often with conflicting objectives. There will not be a single objective, and discretionary interpretation favors some members over others.

Frank H. Easterbrook, *What Does Legislative History Tell Us?,* 66 Chi.-Kent L.Rev. 444, 446–47 (1990). Perhaps this is why "[i]nvalidating laws on the basis of allegedly unconstitutional motives of legislators has a checkered history in constitutional law." Denning, *Reconstructing Doctrine,* 50 Wm. & Mary L.Rev. at 502; *see also* Dan T. Coenen, *A Constitution of Collaboration: Protecting Fundamental Values with Second Look Rules of Interbranch Dialogue,* 42 Wm. & Mary L.Rev. 1575 (2001) (discussing the controversy over purpose inquiries).

More than one legislative objective might reasonably be attributed to the tax exemption for basic cable services and the 1999 legislation. When first proposed in 1984, the exemption appeared to stem from the belief that, where access to local television programming was only available by cable service, no tax should be assessed for such service. One senator made the following statement:

> The basic rate may include some channels. But over in McKenzie and Union City and others where you can't reach

---

**10.** Paula Wade, *As Taxes and Bills Rise, Cable Firms Get A Break,* The Commercial Appeal, Aug. 20, 1999, at A1.

**11.** *Id.*

Nashville and some of the programming areas very well, you either have to put up an expensive antenna or you go on cable. And a lot of folks over that way have elected to go on cable, and that's the way they get their news, weather, and sports, which I think is regular programming and probably shouldn't be paid for. I hope you will support this amendment.[12]

Another senator commented: "I think what we are looking for is to give those people in Appalachia and those people in the mountains the right to get the basic services free, and I'm for that and I understand that, and I think cable does a lot of good." [13]

Although the Department of Revenue promulgated a rule defining basic cable television service, the Department and the cable industry interpreted what constituted basic service differently. In the bill summary, the Department of Revenue also cited "determining what programming may be included in the basic, tax-exempt package delivered by traditional cable" as another problem prompting the legislation. Therefore, concerns over the disparate tax treatment of satellite and cable could not be seen as the only impetus for the 1999 legislation.

Despite the fact that the legislative objective behind the 1999 legislation may be uncertain, as DIRECTV and DISH note, the objective of the cable industry was clear, as was their argument for maintaining the exemption for cable services. The cable industry emphasized that, unlike cable providers, satellite providers "do not have a significant presence or make a significant investment in Tennessee." While such a statement, if adopted as a preamble to the 1999 legislation, would evidence an impermissibly discriminatory purpose, we cannot assume that the Legislature embraced the cable industry's argument. *DIRECTV, LLC v. Dep't of Revenue*, 470 Mass. 647, 25 N.E.3d 258, 272 (2015). Legislative history is far more problematic when sources outside of the Legislature are consulted, or we "speculate upon the significance of the fact that a certain interest group sponsored or opposed particular legislation." *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 120, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001); *see also Kelly v. Robinson*, 479 U.S. 36, 51 n. 13, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986) ("[N]one of those statements was made by a Member of Congress, nor were they included in the official Senate and House Reports. We decline to accord any significance to these statements.").

## C. THE DISTINCTION BETWEEN SATELLITE AND CABLE PROVIDERS

Before delving further into either precedent or legislative history, we must address a threshold question, specifically whether satellite providers and cable providers are "substantially similar entities." *See Gen. Motors Corp.*, 519 U.S. at 298, 117 S.Ct. 811. "Disparate treatment constitutes discrimination only if the objects of the disparate treatment are, for the relevant purposes, similarly situated." *Camps Newfound/Owatonna, Inc.*, 520 U.S. at 601, 117 S.Ct. 1590 (Scalia, J., dissenting). DIRECTV and DISH argue, not unconvincingly, that satellite providers and cable providers are substantially similar entities because consumers view satellite and cable as similar and substitutable. One need look no further than his mailbox

---

**12.** S. Fin., Ways & Means Comm., 93rd General Assembly, 1st Extraordinary Sess., Tape 2 (Feb. 14, 1984) (statement of Sen. Milton H. Hamilton, Jr.).

**13.** *Id.* (statement of Sen. Stephen Ira Cohen).

or television screens, where their commercials appear, for evidence that satellite providers and cable providers are ardent competitors for customers.

What constitutes "substantially similar entities" has not been extensively explored by the courts. *See Gen. Motors Corp.*, 519 U.S. at 298–99, 117 S.Ct. 811 (the "central assumption [of substantially similar entities] has more often than not itself remained dormant in this Court's opinions on state discrimination subject to review under the dormant Commerce Clause....."). At the very least, the entities must be in competition to be substantially similar entities. "[I]n the absence of actual or prospective competition between the supposedly favored and disfavored entities in a single market there can be no local preference, whether by express discrimination against interstate commerce or undue burden upon it, to which the dormant Commerce Clause may apply." *Id.* at 300, 117 S.Ct. 811. Yet, even where the entities are competitors, it does not necessarily follow that the entities are similarly situated. *See DIRECTV, LLC v. Dep't of Revenue*, 25 N.E.3d at 266. As an example, although state-regulated natural gas utilities and independent gas marketers may compete for some customers, they are not substantially similar because the natural gas utilities have a "captive market" of residential customers who are not likely to purchase from independent gas marketers. *Gen. Motors Corp.*, 519 U.S. at 301–304, 117 S.Ct. 811. These residential customers benefit from a bundle of services, which in many cases, are mandated by state statute, so although the natural gas utilities and independent gas marketers both sell natural gas, the product sold by

the utilities is different. *Id.* at 294–98, 117 S.Ct. 811.

Despite being competitors, satellite and cable providers do have an important distinction. Cable providers are heavily regulated by the federal government, while satellite providers are "minimally" regulated. *See* 2 C.D. Ferris & F.W. Lloyd, Telecommunications Regulation: Cable, Broadcasting, Satellite, and the Internet, §§ 5.09, 6–17B, 20.04(5)(b) (rev. ed.2014) (hereinafter "Telecommunications Regulation"); *see generally* Paul Valle–Riestra, Telecommunications 91, 94–113, 258 (2002) (outlining federal, state, and local regulation of cable systems and federal regulation of satellite service). Satellite and cable providers are subject to some of the same federal regulations, including political broadcasting rules, equal opportunity employment rules, and commercial advertising limits in children's programming. *See* Telecommunications Regulation, § 20.04(6); *see also* 47 C.F.R. § 25.601. However, any common regulatory burdens are outweighed by the significant public interest regulations imposed on cable providers by Congress and the Federal Communications Commission ("FCC").

Cable television systems are subject to "must-carry" provisions,[14] requiring them to dedicate some of their channels to local broadcast television stations and qualified low power stations. 47 U.S.C. § 534(a); *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997) (holding must-carry provisions constitutional). Additionally, cable television systems with more than 36 channels must carry "the signals of qualified noncommercial educational television stations," requesting carriage, unless those stations would duplicate the programming of an-

---

14. The "must-carry" rule allows broadcasters to choose, every three years, whether to operate under must-carry protection or under the retransmission consent system. *See* 47 C.F.R. § 76.64.

other station being carried. 47 U.S.C. § 535(a); *see also* 47 C.F.R. § 76.56(a)(iii). Local governments may further control cable programming by forbidding cable providers from showing channels with obscene content. *See* 47 U.S.C. § 544(d)(1). Upon request, cable providers must offer customers a device that allows the customer to limit access to certain channels. *Id.* § 544(d)(2). Cable providers must also afford "the same emergency information as is afforded by the emergency broadcasting system." *Id.* § 544(g).

Cable providers' technical and business operations are also regulated in detail. Cable signal quality must comply with standards set by the FCC. *See id.* § 544(e); 47 C.F.R. § 76.601–76.640. Additionally, cable providers are subject to minimum standards for office hours, telephone availability, installation, service outage, repair times, and billing. *See* 47 U.S.C. § 552(b) (2012); 47 C.F.R. § 76.309. Cable company ownership, 47 U.S.C. § 533, 652; cable franchise acquisition, 47 U.S.C. § 547; cable rates, 47 U.S.C. § 543(b),(d); and the transfer of cable television systems, 47 C.F.R. § 76.502, are all regulated by federal law.

For their part, DIRECTV and DISH argue that the differences between the regulatory treatment of satellite providers and cable providers are exaggerated. Yet, even a cursory review of telecommunication regulation reveals that Congress has chosen to more heavily regulate cable providers. *See* Telecommunications Regulation §§ 5.09, 6–17B, 20. Satellite providers are subject to only three primary federal public-interest regulations. In 1996, satellite providers that were authorized for new or replacement satellites were required to provide service to Alaska and Hawaii if technically feasible. *See* 47 C.F.R. § 25.148(c). Second, in 1998, the FCC required satellite providers that of-

fered 25 or more video channels to set aside four percent of their channel capacity for "noncommercial programming of an educational or informational nature." *See* Implementation of Section 25 of the Cable Television Consumer Protection and Competition Act of 1992, Direct Broadcast Satellite Public Interest Obligations, Report and Order, 13 F.C.C. Rcd. 23254 (1998); *see also* 47 C.F.R. § 25.701(f). Satellite providers could choose among "qualified national educational programming suppliers" to fill the set-aside channels. Finally, satellite providers *may* transmit signals of local broadcasters, but they are not required to do so. *See* 47 U.S.C. § 338. However, if the satellite provider chooses to carry one local television station, they must carry all local stations. *Id.* § 338.

The difference in regulatory treatment between satellite and cable and the resulting benefits inuring to cable customers mean that satellite providers and cable providers are not substantially similar entities for purposes of the Commerce Clause. Like the natural gas utilities in *General Motors Corp.,* the bundle of services offered by cable providers differs substantially from the bundle of services provided by satellite providers. Cable providers must offer several public service items, including local broadcast stations, educational stations, emergency information, and certain signal quality. Satellite providers are almost entirely free from these obligations. While the services cable providers *must* offer under federal law may not be widely known to or necessarily coveted by consumers, federal law nonetheless distinguishes the services and cable providers and satellite providers. Therefore, the disparate tax treatment of satellite providers and cable providers does not constitute discrimination.

## IV. CONCLUSION

We reverse the trial court's grant of summary judgment in favor of DIRECTV

and DISH. Because we find that satellite providers and cable providers are not substantially similar entities for purposes of the Commerce Clause, we direct entry of summary judgment in favor of the Commissioner on the issue of discrimination. This matter is remanded for further proceedings consistent with this opinion.